## LYLE CASHION CO. v. McKENDRICK.

### No. 14002.

United States Court of Appeals
Fifth Circuit.

May 19, 1953.

Rehearing Denied July 13, 1953.

610

Hugh M. Wilkinson, Sr., Fernando Cuquet, Jr., Wilkinson & Wilkinson, Hugh M. Wilkinson, Jr., New Orleans, La., for appellant.

H. H. Hillyer, Jr., New Orleans, La., Everette G. Truly, Jr., S. B. Laub, Natchez, Miss. (Laub, Adams, Foreman & Truly, Natchez, Miss., Milling, Saal, Saunders, Benson & Woodward, New Orleans, La., of counsel), for appellee.

Before BORAH, RUSSELL and STRUM, Circuit Judges.

STRUM, Circuit Judge.

Lyle Cashion Company, plaintiff below, appellant here, instituted this suit seeking a declaratory judgment against Charles S. McKendrick, defendant below, interpreting a contract between these parties dated April 29, 1950, relating to the acquisition and development of oil leases in Mississippi.

Plaintiff sought a decree below declaring that McKendrick had no interest in certain oil leases acquired by the plaintiff subsequent to said contract, because McKendrick failed to exercise his option to acquire such interest within the time fixed by the contract. The trial court denied that relief, and upon McKendrick's counterclaim held that McKendrick had duly exercised his option and had thus acquired an undivided ½ interest in the subsequently acquired leases. Plaintiff below appeals from that decree, the determinative question being whether or not McKendrick duly exercised his option rights under the contract of April 29, 1950.

The controversy arose out of the following facts. By contracts dated February 2, 1950, and March 20, 1950, Cashion Company, at the instance of McKendrick, undertook to drill a shallow well on a lease held by Claypool and Proctor as assignees, who, as compensation for the drilling, agreed to assign to Cashion a portion of their interest in the lease on which the well was to be drilled. This was called the Allen well. By a contract between them dated April 29, 1950, being the contract here involved, Cashion and McKendrick agreed that they would jointly share the drilling costs, Cashion agreeing to assign to McKendrick an undivided ½ interest in the leasehold interests assigned to him as compensation for drilling the well, subject to certain burdens running with the lease. In a practical sense, Cashion and McKendrick became partners in the drilling operation.

The contract of April 29, 1950, also contained the following provision: "Should any Party acquire any leases, royalty, etc., within a radius of ten (10) miles of the well site within six months following March 1, 1950, the other party hereto may have an option of purchasing, within the said six months period, one-half (½) of the other Party's purchase, at its net cash cost * * *."

The Allen well above mentioned turned out to be a dry hole, and was abandoned on May 12, 1950. The drilling cost was approximately $12,000, all of which was originally advanced by Cashion Company. When this suit was begun McKendrick had not yet paid his half.[1]

Information acquired during the drilling of the dry well indicated that another well

1. Of this, the trial judge said: "Although the defendant has been unable to pay plaintiff, the plaintiff has assured himself by interview with defendant's accountant that that money and more will be forthcoming out of litigation in which the defendant is presently involved in another court."

might be successful if drilled in a nearby location. About two months after the Allen well was abandoned, Cashion entered into a contract with Robert Oil Company, lessee of a nearby tract, for the drilling of a second well called the Davis well. Robert Oil Company, without cash consideration but reserving a ¹⁄₁₆ overriding royalty interest, assigned to Cashion its interest in a nearby forty acre tract in consideration of Cashion drilling a well thereon. As a result of the joint efforts of Cashion and McKendrick, other nearby leasehold owners assigned their interests to Cashion in consideration of drilling the second well, no cash consideration being paid.

McKendrick was not a formal party to the contract between Robert Oil Company and Cashion for the drilling of the second well, but contends, and the trial court found, that he and Cashion were engaged in a joint venture to acquire and develop oil leases, in which the defendant, McKendrick, was obligated to pay half the expense, and is entitled to an undivided half interest in any lease or royalty interest acquired by Cashion within the area and time fixed in the contract dated April 29, 1950. As no cash consideration was paid for any of the leases, there was no "cost" to be paid other than the drilling expense.

The leasehold acquired by Cashion in consideration of drilling the second well for Robert Oil Company, is one of the leases, and apparently a valuable one, acquired by Cashion "within a radius of ten miles of the first well site, and within six months after March 1, 1950," in which, under the decree below, McKendrick is entitled to a ½ undivided interest, subject, however, to the payment of ½ the drilling costs.

Not having sufficient finances to complete the second well, Cashion and McKendrick both endeavored to raise funds by selling interests in the well. In this financing Cashion was more successful than McKendrick. Cashion finally discontinued sending McKendrick progress reports, and McKendrick became apprehensive as to the liability that might devolve upon him as a joint venturer should this well also turn out unsuccessfully.

On August 15, 1950, McKendrick wrote Cashion asking for the latest developments in the drilling and financing. Cashion claims that he did not receive the letter, though it was not returned to the sender, and it is therefore presumed to have been received. Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861; Atlantic Dredging & Construction Co. v. Nashville Bridge Co., 5 Cir., 57 F.2d 519, headnote 4. Not having received a reply to the first letter, McKendrick wrote Cashion a second letter, dated September 2, 1950, expressing his concern over his existing indebtedness to Cashion on account of the first well, and indicating his desire not to incur further indebtedness, stating his willingness to accept a smaller interest than originally agreed upon if he was exposed to no further liability.[2] This letter was received, but not answered by Cashion. The parties also had several conversations along the same line, in which McKendrick indicated his desire to "get out" because of possible liability if the second well should prove unsuccessful.

Cashion did not definitely accept these proposals when they were made by McKendrick, but when the second well turned out to be a producer Cashion quickly agreed to

2. This letter in part stated: "With reference to your letter of August 24, you inquired about the balance that I owe you from the Carrie Allen No. 1 well. At the time of this agreement, I made it plain to you that I would not be able to pay this until my law suit was settled. I have reliable information that it will be about the middle of October before this matter will be decided.

With regard to the drilling contract that you signed with the Robert Oil Company, I think we should have a thorough understanding so that when the well is drilled, we shall both know our exact status. * * *.

Therefore, please, before this work begins, dictate a letter to me showing my definite position, and if you have this well financed, I will be glad to take a smaller amount that (sic) I originally contemplated. The reason for this is that I got the deal and One-fourth (¼) of the money; therefore, I will be satisfied with a One-fourth (¼) interest."

let McKendrick "get out," while McKendrick as quickly withdrew his proposal to do so. This suit followed.

The trial court found that McKendrick had not exercised his option by formal declaration within the six months period, but that he had effectively exercised it by conduct. In reaching this conclusion, the trial Judge heavily discounted the oral testimony of both Cashion and McKendrick, and rested his decision largely upon the documentary evidence and the testimony of other witnesses. In summarizing his conclusions, the trial judge said: "This case portrays just another oil deal in which the party in whose name the leases are taken, after the well has been successfully brought in, would like to relieve himself of an encumbrance he was glad to use in putting the deal together."

The evidence supports these findings. It appears, as found by the district judge, that when the first well was abandoned, plaintiff and defendant immediately decided to drill another well in the area, which is common practice in oil exploration. The joint efforts of both were employed to obtain acreage for a "drilling block." Although plaintiff advanced the money for drilling the first well, and secured most of it for the second, it is also true that Cashion continually sought and received McKendrick's aid in obtaining many of the leases which made up the drilling block for the second well, and other nearby leases. McKendrick, at his own expense, and without Cashion's help, acquired what is known as the "Reason lease," which was one of the key leases in the drilling block for the second well, and had that lease transferred to Cashion. It also appears that McKendrick materially aided Cashion in securing the Robert Oil Company lease above mentioned. He was present at, and participated in, two conferences between Cashion and Robert Oil Company, at which the details of that contract were worked out and settled. In addition, the Robert Oil Company required the assignment to it of a 1/32 overriding royalty interest in another lease (Pure Oil Company) in which Cashion and McKendrick owned a joint interest, which consti-

tuted a contribution by McKendrick to the consideration for the Robert Oil Company contract. Cashion was originally brought into the enterprise by McKendrick, and though McKendrick has not paid his half of the costs of either well, he is liable to Cashion therefor, and Cashion is looking to him for the money.

██ These and other circumstances in the evidence, including statements by Cashion that he and McKendrick were "partners," and were "drilling some wells together," and that Cashion was carrying McKendrick for his half of the expense, support the trial court's finding that in drilling the second well Cashion and McKendrick were simply continuing their joint venture to acquire and develop oil leases, a relationship which imposes upon the parties the exercise of the utmost good faith. Sample v. Romine, 193 Miss. 706, 8 So.2d 257, 262, 9 So.2d 643, 10 So.2d 346. Since no cash consideration was paid for any of these leases, the only "cost" being the expense of the drilling operations which was to be equally borne by Cashion and McKendrick, there was no necessity for a formalistic exercise by McKendrick of his option rights under the contract of April 29, 1950. His acceptance thereof, however, was clearly and definitely evidenced by his actions and course of conduct, already related, in connection with the acquisition of the drilling block for the second well. Fanning v. C. I. T. Corp., 187 Miss. 45, 192 So. 41, 43; Pioneer Box Co. v. Price, etc., Co., 132 Miss. 189, 96 So. 103, 29 A.L.R. 1349. See also McLean v. Texas Co., 5 Cir., 103 F.2d 989.

██ Moreover, by accepting and retaining the benefits of McKendrick's activities in connection with securing acreage for the second well, Cashion has estopped himself to deny McKendrick's participation in that enterprise. One may not retain the benefits of a contract, and at the same time reject its burdens. United States ex rel. International Contracting Co. v. Lamont, 155 U.S. 303, 15 S.Ct. 97, 39 L.Ed. 160; McLean v. Texas Co., 5 Cir., 103 F.2d 989.

Affirmed.